UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

      -v-                          :    S3 05 Cr. 517

MANUEL FELIPE SALAZAR-ESPINOSA,     :
    a/k/a "Hoover,"
                                    :
                Defendant.
- - - - - - - - - - - - - - - - - - x


GOVERNMENT'S SENTENCING MEMORANDUM


                              MICHAEL J. GARCIA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                  of America.

ANIRUDH BANSAL
IRIS LAN
Assistant United States Attorneys
    - Of Counsel -



U.S. Department of Justice

United States Attorney
Southern District of New York

---

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

November 30, 2007

**By Hand**
Honorable Lewis A. Kaplan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

        Re: <u>United States v. Manuel Felipe Salazar-Espinosa</u>
             S3 05 Cr. 517 (LAK)

Dear Judge Kaplan:

    The Government respectfully submits this letter to set forth its position with respect to sentencing in this matter, scheduled for December 7, 2007. As discussed below, the Government agrees with the Probation Office that the defendant's United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range is life imprisonment. However, in connection with the defendant's extradition, and pursuant to the extradition treaty with Colombia, the United States has committed to the Colombian government that it will seek a term of years, and not a life sentence. The Government is informed by the Department of Justice's Office of International Affairs that the Colombian government will not consider it a treaty violation if the Government seeks a sentence of 60 years' imprisonment or less. As discussed below, a sentence of between 40 and 60 years' imprisonment would be appropriate under Title 18, United States Code, Section 3553(a). Accordingly, for the reasons set forth below, the Government respectfully requests that the defendant be sentenced to a term of between 40 and 60 years' imprisonment.

I.  **The Defendant's Guidelines Sentencing Range Is Life Imprisonment.**

   A.  **Applicable Guidelines And Grouping Considerations.**

   As the Presentence Investigation Report ("PSR") notes, the two narcotics counts in the Indictment, Counts One and Two, are grouped, since "the offense level is determined largely on the basis of the quantity of [the] substance involved [and] the offense behavior was ongoing or continuous in nature and the offense guideline is written to cover such behavior." U.S.S.G. § 3D1.2(d); see PSR, ¶ 20. Counts One and Two also involve "two or more acts or transactions connected by a common scheme or plan." U.S.S.G. § 3D1.2(b). In addition, Counts One and Two are grouped with Count Three, since the money laundering Guideline applicable to Count Three, U.S.S.G. § 2S1.1, treats the conduct embodied in Counts One and Two (the underlying narcotics offense) as a specific offense characteristic. U.S.S.G. § 3D1.2(c) (counts are grouped "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in ... the guideline applicable to another of the counts"); U.S.S.G. § 2S1.1, cmt. n.6 (where defendant is convicted of money laundering and the underlying offense, the counts are grouped under § 3D1.2(c)). Accordingly, all three Counts in the Indictment are grouped, and the Guideline applicable to all three counts is U.S.S.G. § 2S1.1.

   B.  **Base Offense Level And Enhancements Under Section 2S1.1.**

   Guidelines Section 2S1.1 provides that the base offense level is the offense level for the underlying offense where, as here, "the defendant committed the underlying offense," and "the offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(1). Accordingly, the base offense level is determined under Section 2D1.1, the Guideline applicable to the defendant's drug trafficking crimes.

   1.  Drug Quantity.

   Section 2D1.1 specifies a base offense level of 38 for offenses involving any amount of cocaine in excess of 150 kilograms. U.S.S.G. § 2D1.1(c)(1). Here, the defendant, in his post-arrest statements, admitted to participating in a conspiracy that imported 5,000 to 7,000 kilograms of cocaine per week, and that he had participated in this conspiracy since 2002. Trial

Transcript ("Tr.") at 57-58, 400. Even if the Court were to assume that there were only ten such weeks during Salazar's participation in the conspiracy, this would account for well over 50 tons of cocaine. Salazar was also recorded in the spring of 2005 while planning and organizing a single shipment of approximately one and one-half tons of cocaine; Salazar's recorded statements made clear that he had coordinated other similar shipments in the past, sometimes involving up to ten cocaine-laden cranes, and other multi-ton cocaine shipments. See GX 10T at 118 ("There's ten or fifteen machines that go"); id. at 94 ("We've already sent three thousand with that machine"); id. at 120 ("they keep four or five thousand in paste ...; we're going to store them"); id. at 89 ("We got there successfully with four thousand").

Accordingly, based on the evidence at trial, the defendant's base offense level is clearly 38 pursuant to U.S.S.G. § 2D1.1(c)(1). Indeed, conservatively speaking, the amount of cocaine involved in the defendant's offense is at least tens of times the 150 kilograms necessary for a base offense level of 38. Were the defendant's Guidelines sentencing range not already life imprisonment – and if the Court were to find otherwise – the Government would seek an upward departure pursuant to application note 13 to Guidelines Section 2D1.1, which states:

> In an extraordinary case, an upward departure above offense level 38 on the basis of drug quantity may be warranted. For example, an upward departure may be warranted where the quantity is at least ten times the minimum quantity required for level 38.

U.S.S.G. § 2D1.1, cmt. n. 13 (emphasis added). Here, the amount of cocaine seized from the defendant is nearly ten times the minimum quantity required for a base offense level of 38, and a conservative estimate of the amount of cocaine involved in the defendant's offense is over 300 times that amount. If there is an appropriate case for an upward departure under application note 13, this would be it.

### 2. Constructive Possession Of A Dangerous Weapon.

In a recorded conversation admitted at trial, the defendant is heard discussing a large shipment of 4,000 kilograms of cocaine, 700 kilograms of which were sent to Chicago. GX 10T at 89-93. The price at which the cocaine was sold in Chicago indicated that the shipment occurred during the time frame

charged in Count One of the Indictment, 2002 to 2005. GX 10T at 93 ("[i]t was going for seventeen [$17,000 per kilogram]; sell it for thirteen [$13,000 per kilogram]"); Tr. at 361 (price of a kilogram of cocaine during 2002 to 2005 time period was "[$]18,000 at the low end"; price in 1999 and 2000 was higher, ranging between $21,000 and $27,000). While describing this shipment, which had traveled through Mexico while concealed inside a shipment of doors, Salazar noted that it "was being guarded[,] was being accompanied" by armed corrupt officers of the Mexican Attorney General's office. GX 10T at 91. Salazar noted that members of a State Judicial police unit attempted to "rob us [of] our load," resulting in a shootout, during which one of the state Judicial Police officers was killed. GX 10T at 90-91.

Guidelines Section 2D1.1(b)(1) requires a two-level upward adjustment in a defendant's offense level "[i]f a dangerous weapon (including a firearm) was possessed ...." Because "[t]he enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons," possession of a dangerous weapon by the defendant, including constructive possession, is sufficient to warrant an enhancement "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n. 3.

As the Second Circuit has stated, "[t]he defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required 'so long as the possession of the firearm was reasonably foreseeable to the defendant.'" United States v. Stevens, 985 F.2d 1175, 1188 (2d Cir. 1993) (quoting United States v. Soto, 959 F.2d 1181, 1186 (2d Cir. 1992)). The Circuit has elaborated that a defendant may be held responsible for possession of a firearm under Section 2D1.1(b)(1) if (1) the defendant "constructively possessed the weapon by having 'dominion ... or control over the item itself, or dominion over the premises where the item [was] located'"; or (2) a co-conspirator's "'possession of the firearm was reasonably foreseeable to'" the defendant. United States v. Ortega, 94 F.3d 764, 768 (2d Cir. 1996) (citations omitted). Accordingly, "once the government has established that a weapon's presence was reasonably foreseeable to the defendant during conduct ... relevant to the offense ... at issue, the enhancement will apply ... unless the defendant demonstrates that it is clearly improbable that the weapon was connected with the drug offense." United States v. Smith, 215 F.3d 237, 241 (2d Cir. 2000); see United States v. Braggs, 317 F.3d 901, 904 (8th Cir. 2003) (under

Section 2D1.1(b)(1), "possession may be constructive, if it was reasonably foreseeable that a co-conspirator would have possessed a weapon"); United States v. Starks, 309 F.3d 1017, 1026 (7th Cir. 2002) ("The government may meet its burden by showing actual or constructive possession.").

Here, it is clear that the corrupt Mexican police officers' possession of weapons was at least reasonably foreseeable to the defendant. The defendant's description of the cocaine shipment resulting in the shootout makes clear that he played a supervisory role in the shipment. For example, in describing what happened after the problems in Mexico, Salazar stated, "I sen[t] over seven hundred to Chicago." GX 10T at 92. The defendant also complained that because of the poor quality of the cocaine, it could not be sold at the going rate of $17,000 per kilogram, but instead had to be sold at $13,000 per kilogram; only someone who had a financial stake in the resale of the shipment would have complained about its low resale value in the United States. GX 10T at 93. Salazar's leadership role in his organization in general, discussed in more detail below, lends further support to the conclusion that he was aware of the arrangements to have corrupt Mexican police guard the shipment as it traveled through Mexico, and therefore aware that the shipment would have an armed escort.

In light of the foregoing, the dangerous weapon enhancement applies to Salazar's offense unless it was "clearly improbable" that the weapons at issue were connected with the offense. Smith, 215 F.3d at 241. Here, no such showing can be made, and indeed the facts are quite to the contrary. Salazar's recorded words make clear that the corrupt officers' firearms played an integral role in the shipment the defendant was overseeing. Accordingly, a two-point enhancement under Section 2D1.1(b)(1) is appropriate.[1]

---

[1] The PSR has included a two-point enhancement pursuant to U.S.S.G. § 2D1.1(b)(2)(A), based on the fact that "the defendant recruited pilots to fly the narcotics from Colombia to Mexico." PSR, ¶ 24. While the language of the Guideline suggests that it is applicable to these facts, at least one Circuit Court has held that in order for the enhancement to apply, the aircraft have to be used to actually transport the narcotics across the United States border, rather than during a previous leg in the importation. See United States v. Joelson, 7 F.3d 174, 180 (9th Cir. 1993) ("Stretching the definition of

3.  Other Section 2S1.1 Enhancements

Section 2S1.1(b)(2)(B) requires that a two-level enhancement be imposed where the defendant "was convicted under 18 U.S.C. § 1956." Salazar was convicted under Section 1956, and the two-level enhancement is warranted.

Accordingly, the offense level under Section 2S1.1 is 42.[2]

---

'used to import' to incorporate any use of a private airplane, regardless of whether it was used during the actual importation of the cocaine, flies in the face of the 'plain language' of section 2D1.1(b)(2)"). But see United States v. Iacullo, 140 Fed. Appx. 94, 102, 2005 WL 1604976, at *7 (11th Cir. July 7, 2005) (enhancement warranted where "a private plane was used several times to pick up cocaine in Colombia and fly it to the Bahamas, while the cocaine was en route to this country") (decision attached as Exhibit A pursuant to Eleventh Circuit Rule 36-2). The Court need not resolve this legal issue, since the defendant's Guidelines sentence is life imprisonment in either event. The Government is therefore not seeking this particular enhancement.

[2]   Notably, the defendant's offense level would have been even higher if it were determined under Section 2S1.1(a)(2). That sub-section specifies a base offense level of 8 plus the number of levels from Section 2B1.1 corresponding to the amount of laundered funds. Here, the defendant admitted to having laundered $12 million to $14 million per week during the conspiracy. A conservative estimate of over $200 million in total funds laundered would yield a base offense level of 36 (8 plus 28 levels under Section 2B1.1(b)(1)(O)). The defendant would then be assessed six levels under Section 2S1.1(b)(1), since he was well-aware that the laundered funds were the proceeds of the importation of a controlled substance; two levels under Section 2S1.1(b)(2) since he was convicted under 18 U.S.C. § 1956; and an additional 4 levels under Section 2S1.1(b)(2)(C) since the defendant was in the business of laundering funds. This would yield an offense level of 48.

## C. The Defendant Was A Leader And Organizer of Criminal Activity Involving Five or More Participants.

In addition, a four-point enhancement is warranted pursuant to U.S.S.G. § 3B.1(a), based on the defendant's clear role as a leader and organizer of criminal activity involving five or more participants. Section 3B1.1(a) of the Sentencing Guidelines requires the sentencing Court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The adjustment applies as long as the defendant "managed only one other participant"; it is not necessary for the defendant to have managed five other participants. United States v. Zichettello, 208 F.3d 72, 107 (2d Cir. 2000); U.S.S.G. § 3B1.1, cmt. n.2. Among the factors bearing on whether a defendant is a "leader" are "the degree of discretion exercised by [the defendant], the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." United States v. Beaulieau, 959 F.2d 375, 379-80 (2d Cir. 1992); see also U.S.S.G. §3B1.1, cmt. n.4 (In determining whether a defendant is a leader or organizer, as opposed to a manger or supervisor, "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.").

"There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy," U.S.S.G. § 3B.1.1, cmt. n.4, because "one conspirator's leadership role is not dispositive on the question of whether another was also a leader." United States v. Duncan, 42 F.3d 97, 106 n.6 (2d Cir. 1994); see United States v. Escotto, 121 F.3d 81, 86 (2d Cir. 1997) (same). A defendant may qualify as a leader by organizing or leading some aspects of the offense even if others played more prominent roles in other respects. See United States v. Wisniewski, 121 F.3d 54, 58 (2d Cir. 1997) (co-conspirator's larger role in "day-to-day management" of money laundering operation did not "foreclose a finding that [the defendant] was also a 'leader'" where he owned the auto dealership that laundered money and was primary beneficiary of crime).

The evidence at trial made clear that Salazar was a leader and organizer in his international cocaine transportation network. This was shown in the evidence of the defendant's role in the April 2005 shipment, and of the defendant's role in his organization's other cocaine trafficking and money laundering activities.

In April 2005, as he was recorded while planning the shipment of cocaine concealed in the crane, Salazar made clear that he had the power and responsibility to organize the shipment. Salazar proposed multiple shipment options during the recorded meeting, and discussed each option in detail, making clear that he was in charge of, and had decision-making authority over the planning of the proposed shipment. GX 10T at 57, 117-23, 128-29 (discussing each option in detail including routes and methods of transportation). The defendant also repeatedly made clear that he - personally - was responsible for the shipment. He stated, for example, "I have this one and this one ready, ready. This one is ready now. I have fifteen hundred that are his. I have a machine for three thousand." (GX 10T at 62). The defendant also reassured Guzman that "We've never had a problem. I mean, I don't have any problems anywhere." (GX 10T at 58).

The defendant's recorded words also demonstrated his complete control over the amounts that would be transported in the shipment:

> I have fifteen hundred. What I have in the big one which is three thousand, but we can put some in it and more. So we will bring them with twenty five hundred. I'll bring it with two thousand instead of bringing them with three thousand. I'll bring it with twenty five hundred. That's not a problem for me.

GX 10T at 95. The defendant also stated that he was responsible for paying the "person that brings us the product." GX 10T at 106 ("What's part of the deal is [U/I] that I have to pay three thousand to the person that brings us the product"). The defendant also negotiated prices with the "shipper" "who pays off the police." GX 10T at 84; see id. at 81 ("The [expletive] was charging me ... eight hundred and fifty dollars and he went up, and he raised it to fourteen hundred. So I said, no .... I'm still fighting this guy [U/I] over those two hundred ....").

The defendant was also responsible for paying and making arrangements for his subordinates, and others involved in the

crane shipment. He provided passports and visas for his workers. See GX 10T at 72 ("I have some, all of them with a Venezuelan passport. We don't even need to buy them a visa. ... A [expletive] visa for those [expletive] costs four thousand dollars"). He also paid the individuals who guarded and maintained the warehouse where the cocaine was stored. See GX 10T at 97 ("It costs me, the guy charges, the one who arrived in Panama, [U/I] dollars.... The storage costs me [U/I]. ... the one who guards the warehouse for the machines and the one that [U/I]").

In particular, the evidence made clear that Salazar exercised authority over Patricio Asaf ("Pato"), and Andres Cajiao Barbarena ("Temo"). Alvaro Ardila testified that "Pato" was working on behalf of Salazar, and that "Temo" "works for Mr. Salazar," managing the warehouse in Panama. Tr. at 230, 237. The recordings also made clear that "Diego" worked for Salazar. The affidavit of Cajiao Barbarena ("Temo"), submitted in connection with the defense motion to take his deposition, also makes clear that Cajiao was receiving his instructions with respect to the warehousing of the cocaine from Salazar. See ECF Document 64, Attachment 1.

Salazar's control over these workers, and of the shipment seized in Panama, is well-illustrated by the fact that he continued to control the shipment through his workers after he was arrested. Ardila testified that "Pato" represented the defendant in negotiations for the shipment after the defendant's arrest, and this was confirmed by Asaf's own recorded words. Tr. at 291-92; GX 12T2 at 7 (Asaf confirming that his "dad" - Salazar - was "aware of all this").

Salazar also played a leadership role with respect to the other shipments involved in the cocaine importation conspiracy. Salazar admitted that he had had direct contact with Oscar Nava Valencia, Armando Valencia, and Jorge Mario Paredes-Cordova - all three of whom are, like the defendant, Consolidated Priority Organization Targets, or drug kingpins. Tr. at 56, 62, 399, 404. Salazar was directly involved with these kingpins in discussions regarding prices and profit margins associated with cocaine shipments. Tr. at 59, 402. Salazar was also well-familiar with the scope of the enterprise in which he was involved, and the routes and methods it used to transport its ton-quantities of

cocaine.[3] Tr. at 57-58.

Significantly, Salazar admitted that he was heavily involved in the recruitment of co-conspirators - specifically pilots who transported the multi-ton shipments of cocaine from Colombia to Mexico en route to the United States. Tr. at 58, 400; see U.S.S.G. § 3B1.1, cmt. n.4 ("recruitment of accomplices" is a factor to consider in determining whether a defendant is a leader and organizer, versus a manager and supervisor). Indeed, Salazar admitted that he was attempting to recruit a pilot for a 5-ton shipment of cocaine when he was arrested in Cali, Colombia in May 2005. Tr. at 62, 405. Salazar's recorded words confirmed his role in the dispatching of cocaine-laden planes:

> And the slew of [expletive] planes we were sending; son of a [expletive]. There was a point in time when everybody was ... brother, my name was circling heaven and earth, and sea.

GX 10T at 71.

Notably, in connection with the cocaine shipment seized in Panama in 2005, and with the other cocaine shipments in which he was involved, Salazar did not handle the narcotics himself, but left that risky responsibility to his subordinates. This is a strong indicator of Salazar's leadership role. See United States v. Noble, 246 F.3d 946, 954 (7th Cir. 2001) (4-level enhancement appropriate where defendant "used his compatriots to insulate himself from some of the perils of [drug] dealing by directing them to engage in the necessary, but risky behavior of transporting and storing drugs").

Salazar also played a leadership role in the money laundering activities in which he was engaged. Salazar admitted that he was responsible for "arrang[ing] money transactions" to repatriate cocaine proceeds from New York to Colombia. Tr. at 401. Salazar also described one such transaction, in which he "arranged the bulk transfer of narcotics proceeds" in the amount of approximately $8 million, and paid the transporters a 5% commission. Tr. at 57. Salazar's responsibility for paying these transporters strongly supports a finding that he played a leadership role in his money laundering activities.

---

[3] Salazar was recorded stating that on an occasion where he was owed money, he "had to send in the troops after him." GX 11T at 32.

Ardila's testimony also made clear that Salazar played a leadership role with respect to his money laundering crime. Ardila testified that Salazar generally dealt with Ardila through his (Salazar's) "employees." Tr. at 189-90, 192-93. Salazar also negotiated – or rather dictated – the commission he would pay to Ardila for the laundering of funds. Ardila stated that in 2003, Salazar "said to his employee in Colombia he would no longer pay 13 percent, because it was too expensive." Tr. at 196. During a face-to-face meeting, Ardila stated, Salazar said "that I should lower it, and I lowered it." Tr. at 197. Salazar also had the power to fire or reassign employees with whom he was not happy, like the employee who, Ardila reported, demanded a commission from Ardila. Tr. at 199-200.

All of the foregoing demonstrates conclusively that Salazar was a leader and organizer of the criminal activity of which he was convicted. Of course, there was also ample proof that the criminal activity involved many more than five participants – including, to name just a few, Asaf ("Pato"), Cajiao ("Temo"), Ardila, Diego, Caballo, the Valencias, Paredes, and the many other individuals who were involved in the numerous cocaine and cash shipments for which Salazar is accountable. Accordingly, a four-point enhancement under Section 3B1.1(a) is clearly warranted.

### D. Combined Offense Level And Guidelines Sentence.

The foregoing calculations result in a combined offense level of 46. The defendant's criminal history category of I yields a Guidelines sentence of life imprisonment.

Notably, the defendant's criminal history category of I is despite his admission to over over 20 years of involvement in high-level cocaine trafficking and money laundering. Were Salazar's Guidelines sentence not life imprisonment, he would surely be a strong candidate for an horizontal departure in criminal history category pursuant to U.S.S.G. § 4A1.3 (horizontal departure may be appropriate where defendant engaged in "[p]rior adult criminal conduct not resulting in a criminal conviction"). Indeed, should the Court determine that the defendant's Guidelines sentence is less than life imprisonment, the Government would seek such a departure.

Hon. Lewis A. Kaplan, U.S.D.J.
November 30, 2007
Page 12

## II.  A Sentence Of Between 40 And 60 years' Imprisonment Is Reasonable And Appropriate Under Title 18, United States Code, Section 3553(a).

### A. Applicable Law

Although a Guidelines sentence is no longer mandatory, the Guidelines nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). In furtherance of that goal, sentencing Courts are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." Id. at 259-60.

The Second Circuit has held that the Guidelines range for a particular defendant does serve as "a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir.), cert. denied, 126 S. Ct. 388 (2005). The Circuit has explained that the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (quoting United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)). Indeed, in Rita v. United States, 127 S. Ct. 2456 (2007), the Supreme Court reaffirmed the central role played by the Guidelines at sentencing, because the Guidelines, by statute, "seek to embody the § 3553(a) considerations, both in principle and in practice." 127 S. Ct. at 2464.

### B.  The Appropriate Sentence In This Case.

As indicated, the Guidelines recommend a sentence of life imprisonment. Nonetheless, primarily to fulfill its treaty obligations, the Government is seeking a sentence of between 40 and 60 years' imprisonment. This is despite the fact that there

is nothing unusually mitigating about Salazar's case. Indeed, if Salazar's case is unusual, it is because of the extraordinary duration, geographic scope and magnitude of his criminal activity.

Prior to his extradition, Salazar was truly a career criminal. He had been involved in cocaine trafficking and money laundering for over twenty years, and was responsible for the importation of <u>tens of tons</u> of cocaine, and the laundering of tens of millions of dollars in cocaine proceeds. Put simply, the harm wrought by Salazar's crimes, in this country and others, cannot be estimated. Perhaps most significantly, Salazar's criminal activity continued after his arrest in Colombia. As indicated, Salazar continued to coordinate the massive shipment of cocaine seized in Panama in July 2005.

The record before the Court makes clear that Salazar is no ordinary drug trafficker and money-launderer. He is, in the Government's view, one of the most prolific international narcotics traffickers ever sentenced in this District. A sentence of 40 to 60 years would be appropriate, and by no means excessive, when measured against the magnitude of the defendant's crimes. Indeed, similar sentences have been imposed in this District on drug traffickers who were, if anything, less significant to the international cocaine trade. <u>See</u> <u>United States</u> v. <u>Alberto Orlandez-Gamboa</u>, 99 Cr. 654 (TPG) (S.D.N.Y. 2005) (cocaine trafficker extradited from Colombia sentenced to 40 years' imprisonment after guilty plea); <u>United States</u> v. <u>Ramiro Lopez-Imitola</u>, 03 Cr. 294 (RPP) (S.D.N.Y. 2006) (heroin trafficker extradited from Colombia sentenced to 40 years' imprisonment after guilty plea); <u>United States</u> v. <u>Jaime Chavez</u>, 02 Cr. 1301 (GEL) (S.D.N.Y. 2006) (cocaine trafficker sentenced to 55 years' imprisonment on cocaine and firearms charges after trial); <u>United States</u> v. <u>Jorge Manuel Torres Teyer</u>, 01 Cr. 021 (GEL) (S.D.N.Y. 2006) (cocaine trafficker sentenced to 38 years' imprisonment after guilty plea); <u>United States</u> v. <u>Jorge Asprilla</u>, 99 Cr. 0101 (TPG) (S.D.N.Y. 2007) (cocaine trafficker sentenced to 30 years' imprisonment after guilty plea).

Hon. Lewis A. Kaplan, U.S.D.J.
November 30, 2007
Page 14

For all of the foregoing reasons, the Government respectfully submits that a sentence of 40 to 60 years' imprisonment would be appropriate in light of the factors set forth in Section 3553(a).

        Respectfully submitted,

        MICHAEL J. GARCIA
        United States Attorney
        Southern District of New York

By: _____/s/_____
    Anirudh Bansal/Iris Lan
    Assistant United States Attorneys
    (212) 637-2516/2263

cc: Linda George, Esq.
    Counsel for Defendant

    Michele Greer
    United States Probation Officer