UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
: 
UNITED STATES OF AMERICA,
:
- v. -  :   S3 05 Cr. 517 (LAK)

MANUEL SALAZAR-ESPINOSA,  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

GEOFFREY BERMAN
United States Attorney
Southern District of New York

Ian McGinley
Assistant United States Attorney
   - Of Counsel -

**PRELIMINARY STATEMENT**

Manuel Salazar-Espinosa ("Salazar") brings this *pro se* motion (the "Motion" or "Mot.") pursuant to 18 U.S.C. § 3582(c)(1)(A) for a reduction in sentence ("compassionate release") based on medical conditions that include hypothyroidism, hyperlipidemia, gout, and cataracts. Salazar also claims that he poses no danger to the community if released and that other factors under 18 U.S.C. § 3553(a) warrant his release.

The Motion should be swiftly rejected. Salazar is suffering from neither a terminal illness nor a debilitating illness that impairs his ability to provide self-care in prison. Furthermore, given the seriousness of Salazar's crimes, the factors set forth in 18 U.S.C. § 3553(a) cut strongly against his early release. In short, there are no extraordinary and compelling reasons supporting his motion.

**RELEVANT BACKGROUND**

**I. Factual Background**

**A. Offense Conduct**

The evidence at trial proved that between 2002 and his arrest in Colombia on May 23, 2005, Salazar oversaw the importation and attempted importation of multi-ton quantities of cocaine into the United States; that Salazar continued his cocaine-trafficking activities after his arrest, overseeing from a Colombian prison a 1.5-ton cocaine shipment from Colombia to the United States via Panama City, where it was seized by Panamanian authorities in July, 2005; and that from 2002 until his arrest, Salazar orchestrated the laundering of millions of dollars in cocaine profits from the United States to Colombia.

1

On June 15, 2007, Salazar was convicted following a jury trial before this Court, of: (1) conspiracy to import cocaine and to distribute cocaine knowing and intending that it would be imported into the United States, in violation of Title 21, United States Code, Sections 963, 952(a), 959(a) and 960(b)(1)(B)(ii); (2) distributing cocaine knowing and intending that it would be imported into the United States, in violation of Title 21, United States Code, Section 959(a); and (3) conspiracy to launder the proceeds of narcotics trafficking, in violation of Title 18, United States Code, Section 1956(h).

1. **Cocaine Importation**

Salazar frequently imported and attempted to import cocaine to the United State. In December 2004, Salazar and a co-conspirator named Alvaro Ardilla-Rojas ("Ardilla")[1] imported approximately 30 kilograms of cocaine to Los Angeles.[2] *See* Tr. 219-20, 22-23. Later, in April 2005 in a meeting recorded by a government informant (the "April 2005 Meeting"), Salazar and his co-conspirators planned to import 1.5 ton shipment of cocaine to the United States. Tr. 234. They plotted to hide the cocaine inside of a crane, which would either be sent from Panama to Mexico, for subsequent distribution to the United States, or the cocaine-laden crane, after reaching Mexico, would be sent by train into the United States. Tr. 236-38.

On May 23, 2005, before the crane shipment was completed, Salazar was arrested in Colombia. While in custody awaiting extradition to the United States, Salazar, through a co-conspirator, continued to orchestrate the shipment of the cocaine-filled crane through Panama to Mexico en route to the United States. Tr. 285, 291-92. Based on information from a

---

[1]  Ardilla was cooperating witness against Salazar at trial.

[2]  "Tr." refers to the trial transcript.

government informant, on July 21, 2005, Panamanian authorities searched a warehouse located in a neighborhood of Panama City to find the crane and the cocaine. Inside, they found two cranes, one larger than the other. The larger crane, freshly-painted, matched a description of the cocaine-laden crane given by Salazar at the April 2005 Meeting with his co-conspirators. Tr. 376. Inside this crane's arm, officers found 1,349 packages of cocaine, and fifteen packages of heroin, with a total weight, including packaging, of 1,580 kilograms. Tr. 380.

The recording of the April 2005 Meeting also captured Salazar describing in detail a shipment of 700 kilograms of cocaine, concealed in doors, that he had caused to be transported to Chicago. Tr. 88-89.

### 2. Money Laundering

Ardilla, acting on behalf of Salazar and at his direction, laundered approximately $10 million in narcotics funds from Mexico to Colombia between 2002 and 2005. Tr. 190-91. Specifically, at Salazar's direction, Ardila concealed millions of dollars in drug funds in air cargo, invoiced and documented as legitimate goods, and directed it to Salazar in Colombia.

### 3. Salazar's Post-Arrest Admissions

On May 23, 2005, Salazar was arrested while traveling to Cali, Colombia, to recruit pilots to fly cocaine to Mexico City, for subsequent delivery to New York. After waiving his *Miranda* rights, Salazar admitted the following, among other things, in a series of post-arrest interviews:

- At the time of his arrest, he was engaged in drug trafficking activities with a Mexico-based cartel called the Valencia Cartel. Tr. 56, 399.

- The first thing he did for the Valencia Cartel was to arrange the shipment of $8 million to Panama that had been generated from narcotics sales in the United States. Tr. 57, 399.

3

- His role in the air transportation of the cocaine from Colombia was to recruit pilots. After the cocaine reached Mexico from Colombia, the cocaine would be off-loaded and then repacked in the containers and then sent to New York via land. Tr. 58, 400.

- He also would arrange money transactions involving narcotics proceeds from New York, New York, to Mexico with the final destination of Colombia, and he laundered millions of dollars on a weekly basis, which represented the drug profit from the shipments of cocaine to New York. Tr. 58-59, 401.

## II. **Procedural Background**

On February 26, 2008, the Court sentenced Salazar to a term of imprisonment of 30 years, to be followed by a lifetime of supervised release, and imposed the mandatory special assessments. The Court also imposed an order of forfeiture in the amount of $50 million.

Salazar has been detained since his arrest in Colombia and is set to be released in July 2031. He is currently housed at the Bureau of Prisons ("BOP"), Federal Correctional Institution at Jesup ("FCI Jessup").

Salazar subsequently appealed his conviction to the Court of Appeals for the Second Circuit, making essentially the same arguments he made in his motion for a judgment of acquittal or a new trial. The Second Circuit affirmed his conviction on September 22, 2009. *See United States* v. *Rojas,* 346 Fed. Appx. 686, 687 (2d Cir. 2009) ("We affirm for substantially the reasons expressed by the District Court. To the extent some of these arguments . . . were properly raised before us in the first instance, we find them to be unavailing"). His petition for writ of certiorari was denied by the Supreme Court on January 25, 2010. *See Salazar-Espinosa* v. *United States*, 130 S.Ct. 1311 (Jan. 25, 2010).

On January 11, 2011, Salazar filed a motion to vacate, set aside or correct his sentence, pursuant to 28 U.S.C. § 2255. On July 11, 2011, the Court denied Salazar's Section 2255

4

petition. *Salazar-Espinosa* v. *United States*, 11 Civ. 0247 (LAK), 2011 WL 2946166, at *2 (S.D.N.Y. July 11, 2011).

On October 4, 2011, Salazar filed a motion in the Second Circuit for a certificate of appealability from the District Court's July 11, 2011 order dismissing the Section 2255 Petition. On March 6, 2012, the Second Circuit denied Salazar's motion for a certificate of appealability.

In May 2012, Salazar moved this Court to set aside the judgment on the Section 2255 motion pursuant to Fed. R. Civ. P. 60(d). The Court denied that motion. *See Salazar-Espinosa* v. *United States*, 11 Civ. 0247 (LAK), 2012 WL 1788145 (S.D.N.Y. May 15, 2012).

## **SALAZAR'S COMPASSIONATE RELEASE MOTION**

### I.     **BOP Application and Denial**

On September 9, 2019, Salazar applied to the BOP for compassionate release. He asked that the Warden at FCI Jessup not act on his request and let 30 days lapse, so that Salazar could file a motion before the District Court. Mot. Ex. A at p. 1. Salazar claimed he was entitled to relief based on extraordinary and/or compelling reasons and also that he is an elderly inmate over 65 years old, who has served more than 10 years in prison. Mot. Ex. A at p. 2. Notably, his application did not detail any health ailments. Rather, he cited his age, purported exemplary conduct in prison, and low risk of recidivism as factors warranting relief.

On November 19, 2019, the Warden denied Salazar's application. Mot. Ex. B at p. 1. The Warden interpreted the application as based on age and percentage of his sentence served, rather than on medical circumstances. In rejecting the application, the Warden noted, among other things, that Salazar's personal circumstances were not particularly extraordinary or

compelling and that sentencing court was aware of these factors at the time of sentencing.[3] The Warden instructed Salazar to appeal through BOP channels, if Salazar was not satisfied with the decision. Mot. Ex. B at p. 1. Salazar did not appeal the Warden's denial.[4]

## II. The Instant Motion

On February 13, 2020, Salazar filed the instant *pro se* motion with the Court. In the motion, he claims, for the first time, that he suffers from "several progressive and serious medical and physical conditions, which in combination substantially diminish his ability to self-care" within prison. Mot. 7-8. Specifically, Salazar lists the following medical conditions: (1) hypothyroidism; (2) hyperlipidemia; (3) gout; (4) cataracts; (5) hypertension; (6) pain in his joints; (7) dermatitis; and (8) dermatitis. The motion does not claim that Salazar has any terminal conditions; nor does it address what level of self-care Salazar is capable of at FCI Jessup.

The motion also cites his age and that he has served over 10 years in prison as reasons for relief. Mot. 12. Salazar also claims that because he did not commit a violent offense and he will be deported to Colombia once he finished his sentence, he poses no danger to the community if released. Mot. 14-15. With respect to the § 3553(a) factors, the motion notes that he committed these crimes outside of the United States, he has no prior criminal history, and he is at a low risk

---

[3] In rejecting Salazar's age based claim, the Warden found that Salazar was not an inmate "age 65 or older who had served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced," under the applicable BOP regulations.

[4] As a result, there is an argument that Salazar failed to exhaust his administrative remedies, especially because he did not raise his purported health issues in his application to the Warden. However, the Warden waited longer than 30 days to respond, which seemingly permits Salazar to file in District Court, even when the Warden ultimately responds after the 30 days.

of recidivism. In the motion, there is essentially no acknowledgement that Salazar made millions of dollars by playing a key role in a large-scale money laundering and drug enterprise that imported tons of dangerous narcotics into the United States.

## THE MOTION SHOULD BE REJECTED

Given the seriousness of Salazar's crimes and their harm to the United States, it would take a truly extraordinary and compelling set of circumstances to justify compassionate release. Salazar's motion does not come close to satisfying this criteria. Accordingly, the Motion should be rejected.

**I.    Applicable Law and Regulations**

   **A.    Statute and Guidelines Policy Statement**

Salazar seeks relief under 18 U.S.C. § 3582, which was recently modified by the First Step Act. The present version of the statute provides, in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>   (i) extraordinary and compelling reasons warrant such a reduction . . .
>
>     and that such a reduction is consistent with applicable
>     policy statements issued by the Sentencing Commission.

As the statute makes clear, there are two procedural avenues for an inmate to seek relief. First, the Director of the Bureau of Prisons ("BOP") may make a motion seeking relief on the inmate's behalf. Second, if the inmate is unsuccessful in getting the BOP to make a motion on his behalf (and has administratively exhausted remedies within the BOP), the inmate may make a direct motion to the Court.

The substantive criteria for relief under § 3582 appear at the policy statement at § 1B1.13 of the Sentencing Guidelines, which sets forth what qualifies as an "extraordinary and compelling reason" under the statute. *See Dillon v. United States*, 560 U.S. 817, 827 (2010); 28 U.S.C. § 994(t) (delegating authority to U.S. Sentencing Commission to define "extraordinary and compelling reason").[5]

Application Note 1 of § 1B1.13 sets forth, as relevant here, two ways that a defendant can show an "extraordinary and compelling reason."

First, the medical condition of the defendant can justify compassionate release if (i) the defendant is suffering from "a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," or (ii) the defendant is suffering from "a serious physical or medical condition," "a serious functional or cognitive impairment," or "deteriorating physical or mental health because of the aging process," that "substantially diminishes the ability of the defendant to

---

[5] Salazar contends that this policy statement is no longer applicable because it pre-dates the First Step Act and that the Court should have broad leeway to define "extraordinary and compelling" reasons. *See United States v. Beck*, No. 13 Cr. 186, 2019 WL 2716505, at *5 (M.D.N.C. June 28, 2019) ("There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act"); *United States v. Cantu*, No. 15 Cr. 458, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (finding that in the absence of a applicable policy statement, "the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief"). As detailed below, Salazar's motion should be denied under any definition of extraordinary and compelling.

provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Application Note 1(A).

Second, the age of the defendant can justify compassionate release if "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." Application Note 1(B).

Application Note 1 further provides that compassionate release can be justified if "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."[6]

### B. BOP Program Statement 50.50

BOP Program Statement 5050.50 ("PS 50.50") sets forth the administrative procedures the BOP will follow when considering inmate requests, as well as the substantive criteria the BOP uses to evaluate whether a motion is appropriate. The substantive criteria largely mirror the criteria set forth in § 1B1.13, with some differences.

In non-terminal cases, PS 5050.50 provides that "consideration may also be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover," if that inmate is either (1) "[c]ompletely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair" and (2)

---

[6] The family circumstances of the defendant can also provide an extraordinary and compelling reason. Application Note 1(C). That ground is not asserted in Salazar's motion.

9

"[c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."

With respect to applications based on the age of the defendant, PS 5050.50 provides that consideration may be given to: (1) defendants "age 70 or older and have served 30 years or more of their prison term"; (2) defendants of age 65 and older who have served at least 50 percent of their sentence and who "suffer from chronic or serious medical conditions related to the aging process" that is not substantially improved with treatment; (3) defendants "age 65 or older who have served the greater of 10 years or 75% of the term of imprisonment to which the inmate was sentenced."

Unlike § 1B1.13, the BOP considers only circumstances "which could not reasonably have been foreseen by the court at the time of sentencing."

### C. 18 U.S.S.C. § 3553(a)

Regardless of the theory of "extraordinary and compelling reason" that a defendant proceeds under, the 18 U.S.C. § 3553(a) factors are relevant to whether compassionate release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13.

## II. Salazar Is Not Entitled to Compassionate Release

Under any applicable standard, Salazar is not entitled to compassionate release. As to his health claims, while Salazar may have some health issues, he does not have any medical condition that is so severe as to justify relief. His conditions may affect his qualify of life to varying degrees, but none is particularly serious or debilitating and he does not claim, except in a conclusory fashion, that the BOP is failing to address these health conditions. Indeed, Salazar

did not even raise these health conditions in his administrative application for compassionate release to the Warden at FCI Jessup.

In this regard, Salazar is not similarly situated to the defendants in the cases he cites supporting his motion. *See, e.g., United States v. Beck*, No. 13 Cr. 186, 2019 WL 2716505 (M.D.N.C. June 28, 2019) (granting motion for compassionate release where defendant suffered from breast cancer and BOP's lack of medical care prevented the defendant from timely obtaining urgent tests and treatment, while the cancer spread to the defendant's lymph nodes and possibly to her right breast); *United States v. Cantu-Rivera*, No. 89 Cr. 204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) (granting compassionate release motion where defendant spent 30 years in prison and was experiencing serious deterioration in his health caused by arthritic conditions in multiple joint, diabetes and prostate conditions). Unlike these defendants, Salazar does not suffer from a life-threatening illness, or a serious deterioration in heath, and he has served less than half his sentence in prison.

Further, even if Salazar could be deemed to meet the baseline criteria for any of the theories of relief, the § 3553(a) factors weigh against his release. While Salazar did not *per se* commit a violent offense, the magnitude of narcotics he imported into the United States unquestionably did significant harm to the health and safety of our communities. It is of no moment that Salazar was physically outside of the United States at the time he committed these crimes; the impact of the crimes occurred here. Nor is it any comfort that, if released, Salazar will be deported to Colombia, where he was located when he committed these crimes. Finally, Salazar proceeded to trial, appealed his conviction, and has since filed numerous collateral motions to overturn his conviction. At no time since his conviction has he demonstrated any

meaningful acceptance of responsibility for his crimes. Indeed, in the instant motion, he continues to contend that the evidence against him, which was overwhelming and included a confession, was "circumstantial based on the testimony of cooperating defendants looking to mitigate their sentences." Mot. 14.

## **CONCLUSION**

For the reasons stated above, the Government respectfully requests that the Court reject Salazar's Motion.

Dated:       New York, New York
             March 30, 2020

>                                    Respectfully submitted,
>
>                                    GEOFFREY BERMAN
>                                    United States Attorney for the
>                                    Southern District of New York
>
>
>                               By:         /s/
>                                    Ian McGinley
>                                    Assistant United States Attorney
>                                    (212) 637-2257

**CERTIFICATE OF SERVICE**

I, Ian McGinley, Assistant United States Attorney for the Southern District of New York, hereby certify that on March 30, 2020, I will cause a copy of the foregoing Memorandum of Law of the United States of America in Opposition to the Defendant's Motion for Compassionate Release to be served by United States mail, upon:

    Manual Salazar-Espinosa
    Reg No: 59264-054
    FCI Jesup
    2600 Highway 301 South
    Jesup, Georgia 31599

Dated: New York, New York
        March 28, 2020

                                            _____/s_____
                                            Ian McGinley
                                            Assistant United States Attorney
                                            (212) 637-2257