IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


UNITED STATES of AMERICA,
            Respondent,

V.                              CASE No: 3:05-Cr-517(LAK)


MANUEL SALAZAR-ESPINOZA,
            Defendant.         /


REPLY To THE Government's Memorandum of Law
in OPPOSITION To The Defendat's Motion for
            Compassionate Release


    Manuel Salazar-Espinoza (The Defendant), in
"Pro Se," files This Reply To The Government's motion
in opposition of his motion for reduction in Sentence—
Compassionate Release filed on February 13, 2020, and
in support herein States as follows:

    The Government argues Salazar is not entitled To a
reduction in Sentence under The First Step Act amendment
To 18 U.S.C. § 3582(c)(1)(A)(i) because he: (i) is not

suffering from neither a terminal illness nor a debilitating illness that impairs his ability to provide self-care in prison; and (2) given the seriousness of Salazar's crimes, the factors set forth in 18 U.S.C. § 3553(a) cut strongly against his early release. The Government also makes several incorrect allegations which will also be addressed.

The Government mailed its response on March 31, 2020 using Federal Express. Salazar received it on April 1, 2020. On the same day however, due to the Covid-19 situation the BOP placed every institution in lock-down status confining all prisoners to their cells until further notice. This lock-down has prevented access to legal material, electronic legal library, to typewriters, and copy machine inhibiting Salazar's ability to respond. After seeking an extension of time the court granted until June 15, 2020. The lockdown has continued more severely now locked 24/7 due to the racial disturbances. Thus, Salazar has no option but to file this handwritten motion.

1. Note (1)(A)(ii) of Section 1B1.13 of the Guidelines does not require that Salazar be unable to function in a Correctional facility. Rather it requires that he have only

a Substantially diminished ability
To Provide Self-Care Withing The
Correctional facility environment.

The Government argues That under The applicable
standard Salazar is not entitled To Compassionate
release because he does not have any medical Condition
That is so severe as To Justify relief. The Government
howeve, Concludes That Salazar's medical Conditions
may affect his quality of life To Varying degree, but
not Particularly Serious or debilitating.

These statements Sounds as if The Government has
a PHD in medicine and made a Physical examination
of The defendant and an analysis of his quality of
life in Prison. In Truth however, The attorney for
The Government does not have a medical degree,
much less a PHD, nor does he knows about The
quality of Salazar's Prison life, or what effect
Would The several Progressive medical Conditions
Would have on a 69 Year old man as Salazar, or
The effect of This Prolonged lock down combined.

As stated above Note (1)(A)(ii) of §1B1.13 of
The Sentencing Guidelines does not require That
The Prisoner be unable To function in a Correctional

-3-

facility, but rather, that he have a substantially diminished ability to provide self-care within the Correctional facility environment. See United States v. Mc Graw, 2019 U.S. Dist. Lexis 78370, Nº: 2:0 2-cr-00081-LJM-CMM-01, at *9-11 (S.D. Indiana May 9, 2019) (holding that: "Taking together, the Court finds that the defendant's chronic, serious conditions, including those that are mitigated when properly treated by medical professionals, demonstrate a substantially diminished ability to provide self-care from which he is not expected to recover. Extraordinary and compelling reasons therefore supports a reduction in sentence).

Salazar is a 69 year old man who among other things suffers from a severe and "acute Gaut." As a result he has painful inflamation of his joints, feet, and toes and hands to the point that at times he can't even walk to the cafeteria due to the pains in his joints and feet and the lack of grip in his hands due to pain. The lack of movement during this lock down is making this condition much worst.

His acute hypertension (high blood pressure) combined with the hyperlipidemia which causes fatty substances, or blood plaque to adhere to the inner

—4—

lining of the arterial walls reducing the blood flow places him at risk of a massive heart attack, and due to the lock-down and lack of movement such risk is expotentially increased. His hearing is partially impaired by an "Otis media" condition that causes inflamation of his middle ear resulting in severe pain, dizziness and vertigo placing him at risk of falling which at his age could result in broken bones or worst, broken hip specially when he also suffers "Osteoarthritis" of the pelvic and thigh area which weakens his bone structure. The Otitis media in his middle ear is a recurrent condition that was first diagnosed in 2013 and again in 2017.

These are only some of the progressive medical conditions that substantially diminish Salazar's ability to provide self care within the correctional facility, not to mention that due to his dermatitis and vitiligo condition in his skin he also expiriences severe rash and white patches in his skin specially when unable to get at least 30 minutes of exposure to sun light as now that the institution has been on lock down confining inmates to cells 24/7 since April 1, 2020 due to the Covid-19 and the racial disturbances against police excessive force.

In addition, due to his age he also suffers from a severe case of "Cataracts" that highly impairs his his vision. While this could be resolved by simple corrective surgery today the BOP medical staff has declined to provide him the surgery alleging that when he is deported he can have it corrected in his country.

The Government argus Salazar is not similarly situated to the case of  United States v. Cantu-Rivera, No.: 89-Cr-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019), because Salazar does not suffers from a life threatening illness. Cantu-Rivera was housed at FCI Jesup, Georgia from which he was released, which is precisely wher Salazar is housed. Cantu-Rivera did suffered a life threatening illness. He had an arthritic condition of the joints, was diabetic, and suffered high blood pressure, none of which is life threatening. He was able to walk briskly in the recreation yard for ove an hour.

Salazar's "Gout" and "Osteoarthrosis" combined is a more severe condition than the arthritic condition that affected Cantu-Rivera. They are both age contemporary, howeve, Salazar is unable to walk long distances. While Salazar does not have diabetes he suffers an "acute high blood pressure" that places him at a hishe risk than Cantu-Rivera.

In addition, Salazar's medical conditions and age place him at a high risk of being affected by the Corona Virus. While the Bureau of Prisons professes it has taken measurements for the Covid-19 Pandemic these measurements go contrary to the CDC recommendations and the required social distancing. The only measurement the BOP has taken is to lock down all inmates 24/7 restricting all movement and going at times for days without providing a shower.

For instance, in FCI Jesup where Salazar is detained, the administration emptied-up an entire housing unit for the purpose of doubling up all inmates locked in cells barely 84 sq. feet where there is also two bed bunks, two large locker boxes, an 18 inch by 8 feet counter table, a toilet, a wash basin, and two chairs, barely leaving a strip of 30 inches by 10 feet in which to walk one inmate at a time while the other one remains in his bed bunk.

This lack of movement is severely affecting Salazar's 'Gout' and 'Osteoarthrosis' conditions. The institution has been in this lock-down status since April 1, 2020 and it has gotten worst with the racial disturbances since the BOP has ordered a national lock down in which to move an inmate

even to sick call he is moved handcuffed with hands in his back even if he is the only inmate walking the compound. In addition, the food has become two sandwiches a day because the inmate that cook the food are in lock down.

Thus, the COVID-19 situation represents an additional burden that Cantu-Rivera did not have to face in prison, and it places elderly inmates like Salazar that are afflicted by several progressive illnesses at a higher risk of being affected by the virus specially in over crowded conditions as created by piling all inmates together. One prison in Chicago reported over 80 cases among prisoners at the result of one staff member to came to work affected by the virus, and ove 30 cases among the staff. The entire prison system has become a petri dish for the virus requiring only that one staff member shows up to work while affected by the virus. The world has change since Cantu-Rivera.

Since the COVID-19 Pandemic the Attorney General and the President himself have asked the courts and the BOP to review qualifying cases for compassionate release and home confinement and expedite their release and home confinement to minimize the

Prison overcrowding and The Possible effect of The Virus. In This regards Salazar meets all The requirements for Consideration of Compassionate release. He is 69 Years old meeting The age requirement. He is afflicted by several Progressive illnesses That Substantially diminish his ability To Self-care within The correctional facility. See U.S.S.G. § 1B1.13 (B) & (D).

Further The medical Staff is deliberately neglecting and ignoring his several Progressive illnesses and are failing To Provide adequate medical care and Pain relief medication for The osteoarThritis directing To Purchase over The Counter medicine such as ibuProfen from The Prison Commissary Store which since The Covid-19 Pandemic stopped selling such medicine because it can mascarade The Covid-19 Symptoms not acknowledging That due To The lock down The Store is Closed. (See medical Records medication Summary at APPendix: C). Further due To The aging Proccess There is no expectation That he will recover from These Progressive illnesses.

The Government Takes issue with Salazar's request To The Warden not To act on making a recommendation in his case for him To Proceed To court.

First, The Warden did not heed To Salazar's request delaying his respond for months. Second, a Court may waive The requirement of exhaustion when such exhaustion is futile which is The case with The BOP denying more Than 99 Percent of Compassionate release requests filed by Prisoners. See Washington v. Barr, 925 F. 3d 109, 118 (2d Cir. 2019)(holding a court may waive exhaustion when such is futile).

Prior To The COVID-19 Pandemic Courts were considering and granting Compassionate release motions of Prisoners much younger Than Salazar who had no medical afflictions simply on The basis of changes in law made by The First Step Act. For instance, in United States v. Urkevich, 2019 U.S. Dist. Lexis 197408, No: 03-Cr-37 (D. Nebraska, Nov. 14, 2019), The defendant was 50 years old and had no medical afflictions. He was sentenced To 235 months on Count one for Conspiracy To Possess with intent To distribute methamphetamine; To 60 months on Count Two for Possession of a firearm during a drug Trafficking Crime, 18 U.S.C. § 924 (c); and To 300 months on each of Counts Three and Five both for violation of § 924 (c), and all sentences running Consecutively for a Total

of 895 months. His sentence on Count one was later reduced to 188 months leaving him with a sentence of 848 months, the equivalent of 70 years and 8 months.

Following the First Step Act he filed a motion for compassionate release pursuant to the changes to 18 U.S.C. § 3582 (c)(1)(A)(i) raising as extraordinary and compelling reasons the non-retroactive change in law made by § 403 of the First Step Act which eliminated the consecutive stacking of the 25 year enhancement for a second or subsequent § 924(c) conviction.

At the time of sentencing Urkevich was 35, at the time of compassionate release he had served 15 years, thus, he was 50 years old. The Court granted Urkevich's motion and reduced his sentence finding as extraordinary and compelling reasons the injustice of facing a term of incarceration 40 years longer than Congress now deemed warranted for the same crimes. See also United States v. Maumau, No: 08-00758-TC-11, 2020 WL 806121 (D. Utah, Feb. 18, 2020), where the defendant who was 33 years old with no medical afflictions and had served approximately 13 years out of his 55 year sentence

for Three §924(c) convictions was granted a reduction of Sentence on a §3582(c)(1)(A)(i) motion.

The Government argues that Salazar contends that the policy statement in §1B1.13 of the Guidelines which sets the standards for extraordinary and compelling reasons is no longer applicable because it predates the First Step Act. The Government also seems to suggest that based on Dillon v. United States, 560 U.S. 817, 827 (2010); and 28 U.S.C. §994(t), this policy is mandatory.

First, in Dillon the Supreme Court did not decide the application of §1B1.13 of the Guidelines, or what qualifies as extraordinary and compelling reasons for compassionate release. Instead, in Dillon the Court interpreted §1B1.10 in relation to a reduction in sentence based on a §3582(c)(2) motion on a Sentencing Commission Amendment to the Guidelines. Second, every court that has considered the question as to whether the Sentencing Commission's old policy statement in §1B1.13 Pre-dating the First Step Act is binding on courts after the First Step Act, have concluded that it is not binding becaus the Commission has not

updated the Policy Statement to conform to the new requirements of the statute. See United States v. Maumau, №: 08-00758-TC-11, 2020 WL 806121, at *2-3 (D. Utah, Feb. 18, 2020)(describing the courts discretion and collecting cases on whether §1B1.13 is binding on courts concluding is not.).

In Maumau, the court held that "the correct interpretation of §3582(c)(1)(A) - based on the text, statutory history, and structure, and consideration of Congress' ability to override any of the Commission's policy statements at any time ... - is that when a defendant brings a motion for a sentence reduction under the amended provision, the court can determine under subsection n.1(D) whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. §1B1.13 cmt. n.1(A)-(C), warrant granting relief. See Maumau, 2020 WL 806121, at *3, citing United States v. Beck, №: 1:13-cr-186-6, 2019 WL 2716505 (M.D.N.C. June 28, 2019); and United States v. Conrado-Cantu, №: 1:05-cr-458-1, 2019 WL 2498923, at *5 (S.D. Tex June 17, 2019).

Section 1B1.13, cmt. n.1 of the Sentencing Guidelines outlines four categories under which

Compassionate release is appropriate. Id. at n.1 (A)-(D). The first category covers Prisoners with terminal illnesses, the second addresses prisoners of advance age, and the third applies when a prisoner becomes the sole available caregiver for a child, due to the death or incapacitation of the other parent. Id. at n.1(A)-(C). The final category is a catch-all provision that permits relief when, "as determined by the Director of the Bureau of Prisons, there exist in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in Subsection (A) through (C). Id. at n.1 (D).

While no court of appeals has addressed the issue, district courts have held that an interpretation of the Policy Statement as binding giving the Director of the BOP the sole authority to determine if there exist in the defendant's case any extraordinary or compelling reason other than, or in combination with, the reasons described in Subsections (A) through (C), is inconsistent with the Commission's statutory role, and also inconsistent with the First Step Act, which was enacted to further increase the use of Compassionate release and which explicitly allows courts to grant such

motions even when The BOP finds They are not appropriate. Thus, Courts may, on motions of The defendant, Consider Whether a Sentence reduction is warranted for extraordinary and Compelling reasons other Than Those specifically identified in The application notes To the old Policy Statement. See Maumau, 2020 WL 806121, at * 2-3.

Thus, This Court has The authority and the discretion To consider Salazar's medical Conditions, his age, Time in Prison, and other factors which Substantially diminish his ability To Provide Self Care Within The environment of The Correctional facility from Which he is not expected To recover, in combination with The Covid-19 Pandemic and evaluate such under Subsection n.1(D) of Section 1B1.13 of The Guidelines. Due To his age and Progressive medical Conditions Salazar is at a high risk of Contracting The Covid-19 Virus in Which case it could Turn fatal for him and may cause blood Clots, embolism, damage To The heart lining, and/or leg clots due To lack of movement and Poor Circulation.

## 2. Contrary To The Governments Contention A Reduction in Sentence is Consistent With The Factors Set forth in 18 U.S.C. §3553 (a).

The Government argues That The §3553 (a) factors weigh against Salazar's release because of The magnitude of narcotics he imported To United States Which significantly harmed The health and safety of The communities, and because he proceeded To Trial, appealed his Conviction, and has filed numerous Collateral motions To overturn his Conviction, and has not accepted responsibility for his Crimes.

The Government seems To suggest That a reduction in Sentence under Compasionate release Consideration is only available for Those defendants who plead guilty, do not appeal or collaterally attack their Conviction or sentence, and have accepted responsibility, While Those That excercise Their Constitutional right To Trial by Jury, appealed and Collaterally attacked their Conviction and have exercised Their Constitutional right not To self incriminate are not worthy and should not be Considered for Such relief irrespective of whether They qualify or not. Nothing In The Guidelines supports This Contention.

The courts files however, are repleated with cases in which the defendants have proceeded to trial, have appealed their cases and exercised their right not to self incriminate, including defendants that have been involved in substantial drug trafficking, firearm use and possession and RICO and VICAR violations and nevertheless have been considered and granted relief in the discretion of the court if they meet the qualifying criteria. See United States v. Wong, 2019 U.S. Dist. Lexis 126774, No: 93-cr-1340 (RJD) (E.D. N.Y. July 30, 2019) (Wong was charge and convicted of RICO and VICAR offenses by a jury, appealed, filed collateral review, and was granted compassionate release for medical reasons); United States v. Gray, 2019 U.S. Dist. Lexis 160593, No: 2:02-cr-00018-JMS-CMM-13 (S.D. IN. Sept. 20, 2019) (life imprisonment afte jury trial, granted relief on medical condition).

The Government also argues that due to the seriousness of Salazar's crimes he should not be considered for early release not even on his medical conditions. The evidence in this case however, shows that the Government chose to reward the real drug trafficker in this case.

— 17—

Alvaro Ardila-Rojas, the Government star witness in this case that testified against Salazar, self confessed that he had been involved in drug trafficking and money laundering since 1993 and 1994 up until his arrest in 2005. (Tr. of 6/12/07, at 166). Ardila testified he owned several air cargo companies he used for drug trafficking and money laundering. He named thes companies as Speed Cargo, Commercial Juanita, AirTrans, and Panama Air Cargo. (Tr. of 6/12/07, at 163). He further testified he had trafficked in "approximately 100,000 kilograms of cocaine". (Tr. 6/12/07, at 168). He also testified he had "laundered between $300 and $400 millions". (Tr. 6/12/07, at 165).

He further named several individuals for whom he had trafficked in drugs and laundered money, that is, Herman Rubio, Efraim Rojas, John Villamisar, Jose Guzman, Nicolas Vergonzoli, and Salazar. (Tr. 6/12/07, at 169). He testified he passed information to two ruthless drug traffickers, Herman Rubio and Herman Morales regarding a Colombian ex-Police officer who allegedly had stolen some cocaine from these two drug traffickers. As a result, and without verifying the reliability of the information the ex-police officer was murdered without regard to his family.

-18-

Among other information The infamous government star witness passed to several other drug traffickers such as Efraim Rojas, Miguel Arojabali, Guzman-Morales, and Herman Rubio, was regarding a Colombian Police officer who allegedly stole 500 Kilograms of Cocaine from these people. It is unknown what happened to this second Police officer since Ardilla stated he did not know, but most likely he was also murdered by the Government's star witness saying he was responsible for taking the Cocaine when it is possible that it was Ardilla himself who stole the Cocaine. (Tr. 6/12/07, at 176-77).

He further testified he told these drug traffickers he worked for, that "some employee" at the airport had stolen $50,000 from a shipment of money. As a result that employee was also murdered. No-one ever verified Ardilla's information before murdering these people. Ardilla could have had some grudge against these people perhaps for doing their job and representing a threat to Ardilla's drug and money laundering illegal activities. The Government didn't seem to care their star witness had several people murdered to reward him with time served afte he testified against Salazar but opposes a reduction in sentence to an old sick man alleging the nature of his participation in drug trafficking.

Ardila also described how in 2000 he was introduced to Salazar by Efraim Rojas and John Villamisar during a lunch meeting. He said these people wanted to propose some business to Salazar. But these people were acquainted with Salazar, so why would they need Ardila who was unknown to Salazar to make a business proposition to him. (Tr. 6/12/07, at 179-80, & 184-85).

Salazar, who was not involved in drug or money laundering illegal activities at this time, due to his work as an industrial engineer often traveled to several countries in South and Central America shipping and receiving heavy industrial equipment and as a result knew people in key positions in thes countries such as in customs, agricultural departments and other government oficials. These people had already approached Salazar seeking to use him and his contacts to transport drugs and he had turned them down. They were seeking to convince him though Ardila's description of the activities that will not place Salazar at risk. Salazar however turned the offer down again.

Ardila testified that it was not until 2002 that Salazar came on board with them and he began laundering money throug Salazar's contacts and

—20—

eventually for Salazar himself. Ardila was not laundering money but rather Transporting the money from Mexico To Colombia using Salazar's contacts To see That his shippements won't be searched. Salazar provided This safe passage through his contacts. In Turn Ardilla and associates would pay Salazar with The same proceeds. (Tr. 6/12/07, at 185, 189).

Ardila Testified he was responsible for Trafficking in at least 100,000 Kilograms of Cocaine from 1993 To 2005, and laundered between $300 and $400 millions. (Tr. 6/12/07, at 165). He was also responsible for The murder of several possibly inocent individuals, yet The Government did not hesitate To reward him with Time served for Testifying against Salazar who was one of his underlings. During his Testimony Ardila also made clear That out of all These proceeds ($300 To $400 millions) he laundered only $10 millions going To Salazar which was The money They had paid Salazar for his services. He said This was one million at a Time. (Tr. 6/12/07, at 191-193). Indeed, The Court made a specific clarification about Ardila's activities. (Tr. 6/12/07, at 194-198).

Ardila also Testified about other crimes he allegedly committed with Salazar. He said That in 1994

he provided 30 kilograms of cocaine to send them to Los Angeles. However, in 1994 Salazar was not in Ardila's equation since previously stated he met Salazar in 2000 and began to work with him in 2002. Nevertheless, he stated he approached Salazar to provide someone to receive and sell the 30 kilos in Los Angeles, and that Salazar proposed to use the godfather to one of his children whom Ardila named El Compadre. Ardila said he was introduced to this Compadre but could not provide the Compadre's real name, perhaps because he had no relation to Salazar but rather godfather to Ardila's children. (Tr. 6/12/02 at 218-223).

In reference to a transaction involving 170 kilos, Ardila testified he bought those "for" Salazar, not "from" Salazar. The Government twisted the words around and made it look as if Salazar gave Ardila 170 kilos because Salazar owed Ardila $512,280. Ardila continued to explain he never discussed this 170 kilos with Salazar that he negotiated the transaction with Jorge Asaf (AKA-El Pato) who worked for Salazar. Ardila's story is probably part of man's greatest invention "fiction". (Tr. 6/12/02, at 229-232).

In regards to the drug deal involving the Crane from Panama to Mexico, here, Salazar was a minor participant in such deal. He did not own the heavy

-22-

equipment involved nor did he Purchased or owned The drugs involved. He was howeve, instrumental for The Transportation of The Crane from Panama To Mexico. As an industrial engineer he had The ability and The Contacts To arrainge for the heavy equipment's Transportation without arising any suspecion. The recorded Conversation by Guzman who was The informer Confirms ThaT Salazar discussed The narcotic deal regarding The Crane and also Planned with Ardila, Guzman and others The shipment of The Crane from Panama To Mexico.

Ardila howeve, describes The scheme showing he was The architect of The entire Transaction. He describes how he ordered The drugs Transported from Colombia To Panama. Salazar, who was arrested in May 23, 2005 ShortTy afTe he had This recorded Conversation discussing The shipment of The Crane never got To go To Panama To see The Crane or The drugs. (Tr. 6/12/07, aT 232-244)

Here we have Ardila, an international drug runner Testifying he had been running an international drug EnterPrise for about 12 years, and stating he was responsible for The importation into United States for more Than 100,000 Kilograms of Cocaine" and for "Laundering between $300 and $400 millions from drugs"

-23-

proceeds, saying that he was Salazar's employee when he also testified Salazar entered Ardila's drug/money laundering enterprise for the first time in 2002. It would be ludicrous to believe Ardila and the Government's contention that Salazar was the boss and mastermind of Ardila's enterprise. When did the cart jumped in front of the oxen?

The Government further asserts that Salazar continued directing the Crane drug scheme from a prison in Colombia after he was arrested. The Government paints a picture as if Salazar had an office in prison with private phones to conduct business and impart orders. Combita Prison is designed to house only those defendants that are to be extradicted to United States. The U.S. authorities have a lot of influence at how this prison is bein ran an pay a lot of attention to who is visiting who and the recording of every phone conversation. Yet the Government was unable to provide any recorded conversation in which Salazar is directing and/or imparting orders to anyone or being visited by any of the participants in the Crane drug scheme.

The Government's assertions in this regard are also ludicrous. In Combita prisoners are confined to their cells just as in any othe prison. Ardila testified that

-24-

Salazar was in charge of the cocaine shipment through an individual named "TEMO", who worked for Salazar. But this Temo never visited Salazar in prison, was never brought by the Government to testify in court or was eve interviewed by law enforcement to confirm he was under Salazar's orders. In fact "Temo" wrote an affidavit stating the contrary. (See Exhibit: A, herein attached, copy of Temo's affidavit).

Temo specifically states he was detained in Panama on July 21, 2005 by the DEA and local Police. That he never received any Phone call from Salazar giving him orders or directions. That at the time Salazar was arrested in Colombia in May 23, 2005, there was no cocaine in Panama. That he was visited by one Jose Guzman after Salazar's arrest who introduced himself as the "boss" of the organization and told him the cocaine was going to arrive and to wait for the orders he will give him later.

He further states Guzman reiterated he was the boss and that he was in charge. That he later received a call from Guzman who told him that people from Mexico will arrive to pick up the cocaine and stach it in the Crane. That these people were sent by a one Mr. Aguirre AKA "El Caballo". That he was instructed by

-25-

Jose Guzman that 900 kilograms were owned by himself, Guzman, and 600 kilograms by Aguirre AKA "El Caballo". (See *Exhibit: A:1*, English Translation).

This facts are corroborated by excerpts from a recorded conversation made by the DEA between Jose Guzman and Temo in Panama, where Guzman tells Temo he is the main boss, that he is in charge, that he is Premo's boss and he came personally to supervise the entire operation. (See *Exhibit: B*, Pages 5 v 8 of recorded conversation).

In summary, here we have Ardila, a confessed drug trafficker who confessed to be responsible for smuggling into United States more than 100,000 kilos of cocaine, enough to give one gram of cocaine to one in every three Americans, yet the government argues that it was Salazar who significantly harmed the health and safety of the community and does not deserves relief, but gave time served to Ardila, who in his own words also confessed he was responsible for the murders of several people in Colombia, including at least two police officers. Ardila also confessed to be responsible for laundering between $300 and $400 millions for which he charged between 11 and 13 percent pocketing between 44 and 52 millions profit just from the money laundering, not to mention the drugs profit. Yet, he was not imposed a fine.

We also have Jose Guzman a reknown drug trafficker who ran into trouble with the DEA and began to cooperate financing with drug proceeds, along with a Mexican cartel member named Aguirre AKA "El Caballo," the purchase of 1,500 kilograms of cocaine in Colombia to orchestrate a drug operation drawing Salazar into it through Ardila and then turn it over to the DEA. In essence Guzman was financing the drug operation with drug proceeds for the DEA and claiming credit for a reduction of sentence. Notably Guzman self confessed to be the boss, the one in charge. In fact Ardila testified he knew Guzman was negotiating with the Government but that he trusted Guzman because he had been laundering $5 millions for Guzman on a weekly basis even during the time he was negotiating with the Government. (See TT. 6/13/07, at 317-325). Thus, it appears that Guzman was double dealing on the DEA or he was allowed to do so by the DEA.

By contrast, we have Salazar who has no prior involvement in drug trafficking and who was drawn into drug trafficking and money laundering by Ardila in 2002 under the promise to pay him for using his contacts to avoid his shipments of money from being seized by the authorities in those countries. Ardila, despite his own confessions gets rewarded by the Government with a slap on the wrist

and gets released shortly after testifying against Salazar. Guzman on the other hand receives a light sentence and has long been released despite his long career as a drug trafficker, and Salazar is sentenced to a term of imprisonment of 30 years. Thus, the rookie drug trafficker became prey and the fall guy for Ardila and Guzman.

The Government however, continues to profess that Salazar is the boss of the Ardila/Guzman long standing drug Trafficking organization and opposes a reduction in sentence to the 69 year old man who after being imprisoned for more than 15 years has developed a myriad of medical problems that substantially diminish his ability to self care in prison. As pointed out above the Guidelines do not require that Salazar be entirely unable to function in a correctional facility, but only that he have a substantially diminished ability to do so.

The Government's allegations based on the alleged magnitude of the imported drugs should have been applied to Ardila and Guzman, and should not be the basis to deny relief to Salazar in this motion. Rather, the court should consider whether under the Guidelines criteria and the way such criteria has been applied to cases similar to Salazar's case, Salazar would qualify for the relief he seeks. In fact, recently the District court for the Eastern District

of New York applying the Guidelines Criteria and exercising its discretion under the First Step Act amendment granted relief to a defendant convicted of child pornography based on medical conditions where the only medical conditions cited by the defendant was hypertension. See *United States v. Sawicz*, Case No: 08-cr-287 (ARR) (E.D.N.Y. April 10, 2020).

Finally, Salazar very much regrets his involvement in drug trafficking and money laundering with Ardila and company. Contrary to the Government's assertions he has not accepted responsibility for his actions, he has in fact done so since the day he was arrested. His admissions, as noted by the Government in its response, are testimony of this fact where he clearly details his role in the conspiracy as recruiting pilots to fly the drugs to Mexico for Ardila and company, and arrange for money to be transferred from New York to Mexico, where Ardila will take over and transport it to Colombia. (See Gov't's Response at page 2-3).

Out of the 30 year sentence Salazar is required to serve 25½ years after deducting the Good Time Credits allowed by law which is 54 days per year. He has served 15 years in Prison, that is three times as much as Ardila and Guzman who are responsible for over 50,000 tons of cocaine. He has approximately ten years of his sentence.

## CONCLUSION

WHEREFORE, Salazar respectfully request and prays That This Honorable Court Would consider his plea for a reduction in Sentence/Compassionate release, and grant The relief he Seeks, or any other relief The Court may deem Just and appropriate.

Respectfully Submitted,

Manuel Salazar-Espinoza, in Prose,
Reg. No: 59264-054
FCI Jesup
2680 Hwy 301 South
Jesup, Georgia 31599

— 30 —

# CERTIFICATE OF SERVICE

THIS IS TO CERTIFY, That a True and Correct copy of The foregoing Reply To The Government's Response To The 18 U.S.C. § 3582 (c)(1)(A)(i) motion was mailed Through The institutional mail To The office of The U.S. Attorney at 1 Saint Andrews Plz, New York, NY 10007-1701, on This 9th day of June, 2020.

_____

Manuel Salazar-Espinoza, in Pro Se

Reg: N°: 59264-054

FCI Jesup

2680 Hwy 301 South

Jesup, GA 31599



RECEIVED
JUL 0 5 2020
CLERK'S OFFICE

180038

Mr. Richard Wilson
Deputy Clerk
US District Court
500 Pearl 1st
Floor
NY NY

neopost
03/27/2020
US POSTAGE $02.25

NIXIE        061  SC 1        0207/27/20
RETURN TO SENDER
INSUFFICIENT ADDRESS
UNABLE TO FORWARD
BC: 10007131699     0060N209171-00627